Filed 6/26/24; Certified for Publication 7/24/24 CA2/5 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| ACHRAF SAFIEDDINE, | B320642 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. 21STCV04636) |
| v. | |
| MBC FZ, LLC, et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Monica Bachner, Judge.  Affirmed.

Dudorff Law and Janet Gusdorff for Plaintiff and Appellant.

Ballard Spahr, Chad R. Bowman, Matthew S.L. Cate and Elizabeth L. Schilken for Defendants and Respondents.

————————————————

Plaintiff and appellant Achraf Safieddine brought suit against defendants and respondents MBC FZ, LLC, Al Arabiya Network FZ-LLC, and Middle East News FZ-LLC, seeking damages for an allegedly defamatory news story that ran on the Arabic language Al Arabiya news channel, which was rebroadcast in the U.S. via DISH network, and was also republished on Al Arabiya's website and YouTube channel. Defendants collectively moved to quash on the basis of lack of personal jurisdiction. The trial court concluded there were insufficient minimum contacts with California to support jurisdiction, and granted the motion to quash. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. The Parties

#### A. Plaintiff

Plaintiff Safieddine is a U.S. citizen residing in Beirut, Lebanon, where he practices law. He alleges that he "maintains a domicile" in California and an address in Los Angeles where he "send[s], receive[s] and collect[s] mail for" his Beirut legal practice, although he does not claim to be legally domiciled in California.[1]

#### B. Defendants

Defendants are three "Free Zone" limited liability companies, within the MBC group, "one of the largest media and broadcasting companies based in Dubai, UAE." This case

---

[1] Although plaintiff alleged in his complaint that he "maintains a domicile in Los Angeles County," he does not assert that he is domiciled in California for purposes of diversity jurisdiction. Defendants initially removed the action to federal court, but the court remanded it back, on the basis that it had not been established that plaintiff was domiciled in California.

concerns two news stations broadcast by the MBC group – Al Arabiya and Al Hadath. Both news channels are operated by defendant Middle East News FZ-LLC via a broadcast license held by defendant Al Arabiya Network FZ-LLC.[2] The third defendant, MBC FZ, LLC, is their parent company, which operates sports and entertainment channels. To the extent it is necessary to consider the defendants individually, we refer to Middle East News FZ-LLC and Al Arabiya Network FZ-LLC collectively as the News Companies, and MBC FZ, LLC as the Parent Company.

According to the general manager of the News Companies, Al Arabiya and Al Hadath "constitute the leading source of televised news and information programming across the Middle East and North Africa." The two channels are "free-to-air" broadcast networks distributed by satellite throughout the Middle East and North Africa – available to any viewer in those regions whose television can receive the transmission; no subscription is necessary. The general manager represented that the networks reach more than 11 million viewers throughout the world on an average day, with the "vast majority" of those viewers in the Middle East and North Africa.

DISH Network, a Colorado limited liability company, entered into an International Affiliation Agreement to carry Al Arabiya (but not Al Hadath) in the U.S. The "Whereas" clause of the International Affiliation Agreement states, "**WHEREAS:** DISH desires to obtain the rights to broadcast the audio and/or

---

[2] In his complaint, plaintiff named this entity as Al Arabiya News Channel FZ LLC. Defendants represented, in their motion to quash, that the proper name of this entity was Al Arabiya Network FZ-LCC, and supported that assertion with a copy of a Commercial License from the government of Dubai in that name. We use the name the defendants assert is correct.

video programming channel defined herein as the Service to consumers in the Territory . . . ." Although the document is redacted in part, it appears that there is no corresponding clause indicating any desires on the part of Al Arabiya. The "Service" was defined as a "24-hour-per-day, 7 day-per-week channel consisting of Network Foreign Language . . . news content, and shall contain the same programming content as broadcast by Network in the Middle East under the 'Al Arabiya' brand." The "Territory" was defined as "The fifty (50) United States of America including its territories, possessions, commonwealths and trusteeships." In other words, DISH contracted to retransmit Al Arabiya's programming, in its entirety, to subscribers across the U.S.[3]

Al Arabiya was available only to DISH subscribers who purchased an add-on Arabic language package of channels. At the time of the challenged broadcasts, this consisted of approximately 57,000 subscribers in the United States, approximately 12,000 of whom lived in California.[4]

---

[3] The International Affiliation Agreement for Al Arabiya was executed by the Parent Company, rather than the News Companies.

[4] In plaintiff's opening brief on appeal, he states that the DISH agreement ensured "any story running on Al Arabiya could potentially be seen by millions of US residents including tens of thousands of Californians." While "tens of thousands" might be a legitimate stretch of 12,000 California subscribers, given the likelihood of subscribers living in multi-person households, no similar logic justifies 57,000 nationwide subscribers becoming "millions" of potential US viewers.

News Companies also operate websites for both Al Arabiya and Al Hadath. At the time of the allegedly defamatory news posts, the Al Arabiya website was blocked in the U.S., due to an exclusivity agreement with DISH, but the Al Hadath website was available. No registration was required; anyone could access the websites (as long as they were not geographically blocked).

News Companies also operate YouTube channels for both Al Arabiya and Al Hadath, and sometimes post content from the TV channels there.

### 2. *The Allegedly Defamatory News Story*

The allegedly defamatory story was first published not by respondents, but by a website titled, "Global Fight Against Terrorism Funding."[5] In September 2020 that website posted an article claiming that Hezbollah leader Hassan Nasrallah was funneling money out of Lebanon for his personal use, should he find it necessary to flee. Plaintiff was described as helping Nasrallah launder and hide the funds.[6]

### 3. *Defendants' Publications*

Defendants reported on the Global Fight Against Terrorism Funding story on the Al Arabiya and Al Hadath websites, both television networks, and the Al Hadath YouTube channel. Plaintiff alleged in his complaint that defendants "relied

---

[5] Plaintiff also named, as a Doe defendant, the operator of this website. That person is not a party to this appeal, and our references to "defendants" do not include the Doe defendant.

[6] Hezbollah was designated a Foreign Terrorist Organization by the U.S. Department of State in 1997. (*Licci v. Lebanese Canadian Bank SAL* (2d Cir. 2013) 732 F.3d 161, 165, fn. 1.)

exclusively" on the Global Fight Against Terrorism Funding story. He alleged defendants "did not even conduct the most rudimentary inquiry or investigation in to the claims" before writing their stories.

The challenged broadcasts and articles are these: On September 20, 2020, the News Companies broadcast a report on Al Arabiya and Al Hadath. Thereafter, they posted two videos containing that report on the Al Hadath YouTube channel – one video was the entire one-hour news broadcast; the other was a 2 minute, 47 second clip containing only this story. That same day, both news networks' websites ran stories which were nearly identical to each other, but longer than the text of the broadcast/YouTube story.[7]

After a headline referencing Nasrallah's escape plan, both articles begin with a quote, " 'Nasrallah's escape plan includes transfers from the party's budget and thefts from the state.' " Then, the text of both articles begins, "Hezbollah militia leader Hassan Nasrallah has succeeded in allocating funds in various accounts outside Lebanon, estimated at $1.6 billion, just like other Lebanese politicians, according to the 'GLOBAL FIGHT AGAINST TERRORISM FUNDING' report."

The articles go on to charge Nasrallah with hiding funds in preparation for a so-called "doomsday scenario" when he will be forced to flee. The articles state, "[T]he money earmarked to

[7] Defendants submitted a copy of the text of the 2 minutes 47 second YouTube video, which was identical to the news broadcast, as an exhibit. Defendants submitted a certified translation of the text of that video, as well as certified translations of the text of the two website articles. (Cal. Rules of Court, rule 3.1110(g).) Plaintiff does not question the accuracy of defendants' exhibits; we therefore use the certified translations.

accomplish this disappearance comes from a somewhat fraudulent operation and involves transferring large sums of money to accounts abroad that have been transferred to his family and close associates."

The articles next discuss the sources of the allegedly stolen funds. Those sources are alleged to be varied, among them, "theft of funds directly from the Lebanese state, whereby the funds are transferred by Hezbollah through committees in parliament headed by the party, and then transferred outside Lebanon."

The articles go on to discuss the individuals allegedly involved in the scheme, beginning with two people "fully trusted" by Nasrallah to carry it out – his cousin and his son. Each is discussed by name, and his involvement in the scheme is explained. There follows this paragraph: "The third person is Ashraf Safi El-Din[8], a lawyer with offices in Beirut and California and experience in building corporate structures for Hezbollah around the world that launder money on the party's behalf."

Broadly speaking, the Al Arabiya broadcast (and identical YouTube video) tracks the content of the articles to this point. In terms nearly identical to the website articles, the broadcast discussed the sources of the funds allegedly taken by Nasrallah, and the two individuals he "fully trusts" to assist in the scheme (his cousin and son). It ends with a single paragraph about plaintiff.

While the broadcast ends here, the website articles go on to discuss four different locations to which money is diverted around the world. The articles first discuss Latin America, then West

---

[8] The parties do not dispute that this is a reference to plaintiff.

7

Africa, thirdly Hong Kong, and finally, the United States. Plaintiff is not mentioned in the descriptions of the transactions in the first three locations. The articles then state, "The fourth and final corporate structure is in the United States. Ashraf Safi El Din has opened dozens of companies in the past that deal mainly in real estate. For this special corporate structure, Safi El Din acquired two bankrupt American real estate companies. [¶] Funds are transferred to these companies from Lebanon to another Ashraf al-Din company in the United States called 'Premier Equities and Investment Group Inc.' From these companies funds make their way in small sums (less than $ 10,000) to an account in Europe under the name of Ashraf."

The website articles are accompanied by photographs of several of the players – not including plaintiff. They also include a flow chart purportedly illustrating the scheme, which shows funds flowing to plaintiff from various sources and out from him to the four hiding places. The flowchart was allegedly shown on the broadcast.

The news story broadcast on Al Arabiya could have reached each of the 12,000 California DISH subscribers to packages carrying that channel. Defendants submitted evidence that, according to website analytics, the longer of the two YouTube videos has been watched 4,863 times, but only 11 times by viewers with IP addresses associated with California; the shorter was viewed 14,317 times, but only 146 times by viewers with California IP addresses. Defendants did not present evidence as to how many page views the website articles received from California, but represented that the Al Arabiya website was blocked in the United States at the time the article was posted.

8

### 4. *Plaintiff's Complaint*

On February 5, 2021, plaintiff filed his complaint, seeking to recover from defendants for defamation and intentional infliction of emotional distress. He alleged that the defamatory stories were likely to, and did, cause him "irreparable reputational and economic harm." The complaint was not verified.

### 5. *Defendants' Motion to Quash*

On August 11, 2021, defendants filed their motion to quash, on the basis that California courts could not exercise personal jurisdiction over them. They moved jointly, and analyzed the California contacts of all three defendants together. Their motion was supported by declarations of Parent Company's general counsel and News Companies' general manager, as well as a declaration from defendants' counsel authenticating attached exhibits.

Plaintiff, in opposition, supported his motion with his personal declaration, as well as a declaration from his counsel authenticating attached exhibits.[9]

---

[9] Neither plaintiff's declaration nor his counsel's was properly sworn to under penalty of perjury under the laws of California, as required under Code of Civil Procedure, section 2015.5. Plaintiff's declaration was made "under penalty of perjury under the laws of the United States of America," while his counsel's declaration simply stated, "I declare that the foregoing is true and correct," without mentioning penalty of perjury at all. A declaration not signed under penalty of perjury under the laws of California has "no evidentiary effect" and can be disregarded. (*ViaView, Inc. v. Retzlaff* (2016) 1 Cal.App.5th 198, 217.) As plaintiff's complaint was unverified – plaintiff purported to retroactively verify it in his problematic declaration –plaintiff has failed to present any admissible evidence

The parties' evidence and arguments raised a number of factual disputes, which we now discuss. We first discuss disputes relating to plaintiff's connection with California, then turn to the disputes related to defendants' targeting of California.

A.     *Disputes Related to Plaintiff's Connection with California*

In his declaration, plaintiff set forth his connections to California and the reputational harm he suffered, and could suffer, from the alleged defamation. He testified that he is a U.S. citizen who maintains relationships, both personal and professional, with individuals in the U.S., and specifically California. His spouse is a legal resident of California, and his children are U.S. citizens who maintain their domicile in California. He files tax returns with the federal and California governments. He uses a mailing address in California. His personal law practice focuses on transactional work for businesses "throughout Lebanon, major cities of the world, and within the Lebanese diaspora." He is also a partner in a law firm which has one of the leading litigation practices in the Middle East, and has partners and affiliated lawyers around the world, including Los Angeles. He has "an office representation in Los Angeles County, dedicated for servicing Californians and Americans with interests in Lebanon or any legal services in Beirut, including U.S. corporations requiring export compliance

---

whatsoever to meet his burden of proof on defendants' motion to quash. However, defendants failed to challenge the declarations of plaintiff and his counsel on this basis, either in trial court or on appeal, and we therefore consider the objection waived. (See *Yue v. Yang* (2021) 62 Cal.App.5th 539, 547, fn. 3 [evidentiary objection not raised at trial is considered waived].)

10

for their businesses between Lebanon and the United States." Clients and potential clients contact his "Los Angeles County office," where he sends, receives, and collects mail in connection with his Beirut practice. He offers services in partnership with local American lawyers. Because he represents (in the Middle East) clients in the entertainment industry, Los Angeles "is especially important" for him and his practice. Most of his friends and family viewed or heard defendants' allegedly defamatory news stories about him, either directly or through social media.

Defendants presented evidence that plaintiff is not licensed to practice in California, and the law firm with which he is affiliated claims to "focus[] only in the field of Lebanese, Middle Eastern and off shore business law." In defendants' reply memorandum, they represent that the Los Angeles address claimed by defendant's law firm and used on his tax returns is a commercial building.

B. *Disputes Related to Defendant's Targeting of California*

By far the greatest, and most significant, factual dispute between the parties was whether the News Defendants specifically targeted the forum of California by contracting with DISH to retransmit Al Arabiya to the United States.

The News Companies' general manager testified that the potential viewership of Al Arabiya in California via DISH was 12,000 California subscribers - out of the 57,000 United States subscribers (which latter number he described as "about 0.5 percent of the 11 million people who watch the Al Arabiya Networks on an average day.") He explained that, at the time of the challenged broadcast, DISH's license was exclusive, and U.S.

11

televisions could not access Al Arabiya absent a DISH subscription.  He testified that the News Companies "do[] not actively promote California viewership or advertise to boost DISH subscriptions in California."

In contrast, plaintiff alleged in his complaint that defendants "have spent decades attempting to target the United States Arabic-speaking market."  Upon information and belief, he alleged, "California, specifically, is a significant target for the . . . .  Defendant's Al Arabiya and Al Hadath broadcasts, insofar as California has the largest number of Arabic speakers in the United States, and Los Angeles (308,395) and San Francisco Bay Area (250,000) are home to the 3rd and 4th largest concentration of Arab Americans, respectively."  (Formatting modified.)

Plaintiff also offered evidence that Defendants spent millions to market an Arabic language video-on-demand service in the United States.  Parent Company's CEO testified, in an unrelated action, that, "The United States market is a key component of [Parent Company's] decision to launch this new [video on demand] service for commercial and editorial reasons."  Defendants countered that this service was always intended for a global audience, not just the United States.  It had over one million subscribers before it was released in the United States.  That release did not occur until one month after the allegedly defamatory reports, and those reports have never been available on the service.[10]

---

[10]  Plaintiff also relies on a purported admission of Parent Company's CEO that the United States is the target market for MBC Group's broadcast services.  The alleged quote on which plaintiff relies was a statement in a declaration in an unrelated lawsuit, which plaintiff thereafter modified with brackets.  Defendants submitted the original declaration, in which Parent

## 6.    *Request for Discovery*

Plaintiff's opposition to the motion to quash stated that, if the trial court did not deny the motion to quash, he "requested" jurisdictional discovery.[11]  In this regard, plaintiff raised two specific issues.  First, he was concerned that the declarations submitted by defendants "provide no documentary support for any of their claims as to number of subscribers, location and residence of U.S. subscribers, much less as to their claim of '11 million viewers' worldwide."  Second, he noted that, since he presented evidence controverting some of defendants' claims on subsidiary matters (such as the location of defendants' website servers), "additional inquiry in[to] the veracity and scope of Defendants' connections with California is necessary before the Court takes Defendants' self-serving declarations at face value."

## 7.    *Hearing*

After the motion to quash was fully briefed, the court held a hearing.  Only one portion of the argument is relevant to our appeal:  During argument, defendants suggested that even if

---

Company's CEO simply stated that Arabic speakers are the target market for the video-on-demand service, and that the United States was home to around 4,000,000 Arabic speakers.  He did not mention the broadcast services, nor did he state that the United States was the target market.

[11]    Discovery is self-executing.  A party does not require court permission to conduct jurisdictional discovery.  However, due to the usually short time frame in which motions to quash are heard, plaintiffs often request *continuances* to conduct jurisdictional discovery.  (See, e.g., *Preciado v. Freightliner Custom Chassis Corp.* (2023) 87 Cal.App.5th 964, 972-973; *In re Automobile Antitrust Cases I & II* (2005) 135 Cal.App.4th 100, 127.)

13

there is personal jurisdiction over the News Companies, there is not jurisdiction over Parent Company. When it was plaintiff's turn to argue, the court specifically asked if counsel had an opinion on whether to treat the defendants separately. Plaintiffs' counsel responded that the defendants had acted in unison, but if defendants wanted to "make this an issue then we'd be happy to have more discovery into their precise roles . . . ." The court took the matter under submission.

8. *Ruling*

Nearly one month later, the trial court issued its ruling granting the motion to quash. The court set forth, in detail, the evidence submitted by defendants in connection with the motion. The court then concluded, based on this evidence, that California "is neither the focal point of [the allegedly defamatory reports] nor the alleged harm suffered." The court further concluded that defendant's evidence "suggests Plaintiff's claims do not arise out of or relate to Defendants' alleged contacts with California." The court considered plaintiff's evidence and contentions in opposition, and concluded they were not sufficient to alter the result.[12] In sum, the court found plaintiff did not meet "his burden of submitting evidence to establish specific jurisdiction" over defendants.

---

[12] On appeal, plaintiff suggests the court took an "abacus-like approach" and "simply list[ed] the evidence each side submitted, followed abruptly by the unadorned conclusion that the contacts that do exist with California are not the focal point." We disagree with this characterization of the trial court's order. The court did not simply count the contacts relied upon by each side, but, instead, explained in detail why the evidence on which plaintiff relied did not meet his burden.

14

The court next considered plaintiff's request for discovery, and rejected it on the basis that plaintiff "has not established that it would likely produce evidence of sufficient minimum contacts."  The court did not simply rest on this conclusion, but explained, in detail, the reasons why the areas of inquiry sought by plaintiff would not be fruitful.

9.    ***Judgment and Appeal***

Judgment was entered in favor of defendants on March 7, 2022.  Plaintiff filed a timely notice of appeal.

***DISCUSSION***

1.    ***General Principles of Personal Jurisdiction and Standard of Review***

"California courts may exercise personal jurisdiction on any basis consistent with the Constitutions of California and the United States.  (Code Civ. Proc., § 410.10.)  The exercise of jurisdiction over a nonresident defendant comports with these Constitutions 'if the defendant has such minimum contacts with the state that the assertion of jurisdiction does not violate " 'traditional notions of fair play and substantial justice.' " ' " (*Pavlovich v. Superior Court* (2002) 29 Cal.4th 262, 268.)  " '[T]he "minimum contacts" test . . . is not susceptible of mechanical application; rather, the facts of each case must be weighed to determine whether the requisite "affiliating circumstances" are present.' " (*Ibid.*)

Personal jurisdiction may be either general or specific.  General jurisdiction is not at issue in this case, we consider only whether California can exercise specific jurisdiction over defendants.  "A court may exercise specific jurisdiction over a nonresident defendant only if:  (1)  the defendant has purposefully availed himself of forum benefits; (2) the controversy

15

relates to, or arises out of, the defendant's contacts with the forum; and (3) the exercise of jurisdiction comports with fair play and substantial justice." (*Yue v. Yang, supra,* 62 Cal.App.5th at p. 547.)  Here, defendants' motion to quash addressed the first two elements only; they did not address fair play and substantial justice.

"When a defendant moves to quash service of process on jurisdictional grounds, the plaintiff has the burden of proving, by a preponderance of the evidence, facts justifying the exercise of jurisdiction.  [Citations.]  'The plaintiff must come forward with affidavits and other competent evidence to carry this burden.'  [Citation.]  A verified complaint is the functional equivalent of an affidavit.  [Citation.]  'If the plaintiff meets this burden, "it becomes the defendant's burden to demonstrate that the exercise of jurisdiction would be unreasonable." ' " (*Yue v. Yang, supra,* 62 Cal.App.5th at p. 546.)  If the evidence is undisputed, the issue of whether the defendant is subject to personal jurisdiction is a legal question we review de novo.  (*Ibid.*)  If, instead, the evidence is disputed, we accept the trial court's resolution of all factual issues, drawing all reasonable inferences in favor of the trial court's order, and review the trial court's factual determinations for substantial evidence.  (*Burdick v. Superior Court* (2015) 233 Cal.App.4th 8, 17.)

Here, then, we should consider whether plaintiff met his burden of establishing the first two elements – (1) purposeful availment and (2) controversy arises out of contacts – while accepting the trial court's resolution of factual issues if supported by substantial evidence.  We need only consider purposeful availment.

16

## 2.    *Purposeful Availment*

Our discussion of the law of purposeful availment begins in 1984, when the U.S. Supreme Court decided, on the same day, two cases regarding purposeful availment in defamation cases. These two opinions set out different standards for purposeful availment, depending on whether the defendant's contacts with the forum are direct or indirect.

A.    *Direct Forum Contacts – The* Keeton *Test*

The first case was *Keeton v. Hustler Magazine, Inc.* (1984) 465 U.S. 770 (*Keeton*).  In *Keeton*, the plaintiff (a New York resident) sued Hustler Magazine, Inc. in district court in New Hampshire, alleging she had been defamed in five separate issues of *Hustler*.  (*Id.* at p. 772.)  Hustler Magazine was an Ohio corporation with principal place of business in California.  (*Ibid.*) Its only contact with New Hampshire was "the sale of some 10,000 to 15,000 copies of *Hustler* Magazine in that State each month."  (*Ibid.*)

The court acknowledged that Hustler Magazine's "activities in the forum may not be so substantial as to support jurisdiction over a cause of action unrelated to those activities.  But [*Hustler* Magazine] is carrying on a 'part of its general business' in New Hampshire, and that is sufficient to support jurisdiction when the cause of action arises out of the very activity being conducted, in part, in New Hampshire." (*Keeton, supra,* 465 U.S. at pp. 779-790, fn. omitted.)  "Where, as in this case, respondent Hustler Magazine, Inc., has continuously and deliberately exploited the New Hampshire market, it must reasonably anticipate being haled into court there in a libel action based on the contents of its magazine." (*Id.* at p. 781.)

17

B.     *Indirect Forum Contacts – The* Calder *Test*

Immediately after the *Keeton* opinion, the Supreme Court issued its opinion in *Calder v. Jones* (1984) 465 U.S. 783 (*Calder*). In *Calder*, the plaintiff was actress Shirley Jones, who alleged she was defamed in an article published in the *National Enquirer*.  Jones brought suit against multiple defendants in California court.  The National Enquirer, Inc. and its local distributor did not contest jurisdiction.  Two individuals did:  the article's writer; and the president and editor of the *National Enquirer*.  Both individual defendants were Florida residents, who wrote and edited the article in Florida.  (*Id.* at pp. 784-786.)

The *National Enquirer* had a nationwide circulation of over 5 million copies weekly; roughly 600,000 of these were sold in California – almost twice the circulation of the next highest state. (*Calder, supra,* 465 U.S. at p. 785.)  Clearly, under *Keeton*, the National Enquirer, Inc. was correct to concede jurisdiction in California.  The writer and editor argued, however, that they were not responsible for magazine's circulation in California. (*Id.* at p. 789.)  The Supreme Court agreed that "their contacts with California are not to be judged according to their employer's activities there."  (*Id.* at p. 790.)  Instead, "[e]ach defendant's contacts with the forum State must be assessed individually." (*Ibid.*)

This did not, however, insulate the individual defendants from answering for their article in California court.  The Supreme Court based its conclusion on what would thereafter sometimes be referred to as the "effects test":  "The allegedly libelous story concerned the California activities of a California resident.  It impugned the professionalism of an entertainer whose television career was centered in California.  The article was drawn from

18

California sources, and the brunt of the harm, in terms both of [Jones's] emotional distress and the injury to her professional reputation, was suffered in California. In sum, California is the focal point both of the story and of the harm suffered. Jurisdiction over [the individual defendants] is therefore proper in California based on the 'effects' of their Florida conduct in California." (*Calder, supra,* 465 U.S. at pp. 788-789, fn. omitted.)

The court emphasized that the individual defendants "are not charged with mere untargeted negligence. Rather, their intentional, and allegedly tortious, actions were expressly aimed at California. [The writer] wrote and [the editor] edited an article that they knew would have a potentially devastating impact upon [Jones]. And they knew that the brunt of that injury would be felt by [her] in the State in which she lives and works and in which the *National Enquirer* has its largest circulation. Under the circumstances, [the individual defendants] must 'reasonably anticipate being haled into court there' to answer for the truth of the statements made in their article. [Citations.] An individual injured in California need not go to Florida to seek redress from persons who, though remaining in Florida, knowingly cause the injury in California." (*Calder, supra,* 465 U.S. at p. 790.)

C.    *The* Calder *Test is Clarified in* Walden

Before we can discuss the application of *Keeton* and *Calder* to the facts of the current case, it is necessary to consider a third Supreme Court case which came 30 years after *Calder* and clarified it: *Walden v. Fiore* (2014) 571 U.S. 277 (*Walden*).

In *Walden*, the court considered whether adverse effects felt by the plaintiff in the forum state were, in fact, enough to satisfy *Calder*'s so-called "effects test." In that case, the Nevada

19

plaintiffs, while travelling, were subject to a seizure of their funds by the defendant law enforcement officer in the Atlanta airport.  The money was eventually returned to them at their home in Nevada, but the plaintiffs alleged the defendant delayed that return by writing a false affidavit, causing them harm.  The plaintiffs argued for personal jurisdiction in Nevada under *Calder*, reasoning that the defendant intentionally submitted his false affidavit in Georgia, knowing that it would cause them harm in their home state of Nevada.  (*Walden*, *supra*, 571 U.S. at pp. 279-282, 289, fn. 8.)

The Supreme Court rejected this argument, explaining that "[f]or a State to exercise jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum State."  (*Walden, supra,* 571 U.S. at p. 284.)  The court then expounded on this in two ways.  "First, the relationship must arise out of the contacts that the 'defendant *himself*' creates with the forum State."  (*Ibid.*)  Due process could not be satisfied by demonstrating contacts between the plaintiff or third parties and the forum State.  (*Ibid.*)

Second, the minimum contacts analysis looks at the relationship between the defendant and *the forum state*, not the defendants' contacts with persons who live there.  (*Walden, supra,* 571 U.S. at p. 285.)  "The plaintiff cannot be the only link between the defendant and the forum.  Rather, it is the defendant's conduct that must form the necessary connection with the forum State that is the basis for its jurisdiction over him.  [Citations.]  To be sure, a defendant's contacts with the forum State may be intertwined with his transactions or interactions with the plaintiff or other parties.  But a defendant's relationship with a plaintiff or third party, standing alone, is an

20

insufficient basis for jurisdiction." (*Ibid.*) "Regardless of where a plaintiff lives or works, an injury is jurisdictionally relevant only insofar as it shows that the defendant has formed a contact with the forum State. The proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way." (*Id.* at p. 290.)

The court explained that *Calder* "illustrates the application of these principles." (*Walden, supra,* 571 U.S. at p. 286.) In *Calder*, the court had focused on the contacts the writer and editor had created with California, not just with Jones, by writing/editing the allegedly defamatory story. "We found those forum contacts to be ample: The defendants relied on phone calls to 'California sources' for the information in their article; they wrote the story about the plaintiff's activities in California; they caused reputational injury in California by writing an allegedly libelous article that was widely circulated in the State; and the 'brunt' of that injury was suffered by the plaintiff in that State." (*Id.* at p. 287.) The *Walden* court quoted the *Calder* opinion's language that California was " 'focal point both of the story and of the harm suffered.' " (*Ibid.*)

D.    Calder*'s Progeny*

Different courts have attempted to distill a multi-part test from *Calder*, with varying results. (See, e.g., *Clemens v. McNamee* (5th Cir. 2010) 615 F.3d 374, 380 [holding that, to establish personal jurisdiction under *Calder*, a plaintiff must show (1) the subject matter of the article and (2) the sources relied upon for it were in the forum State – a so-called "subject and sources test"].) California has not adopted the "subject and sources test." Instead, to establish jurisdiction under *Calder*,

21

"[t]he defendant must expressly aim or target his conduct toward California, with the knowledge that his intentional conduct would cause harm in the forum." (*Yue v. Yang, supra,* 62 Cal.App.5th at p. 547.)

E. *Application to this Case*

On appeal, plaintiff does not argue that the trial court's findings were not supported by substantial evidence. Nor does he argue that the facts, as found by the trial court, do not support a finding of lack of personal jurisdiction under *Calder*. Instead, he charges defendants with DISH's California contacts, and combines *Calder* with *Keeton*, to create an argument whereby defendants "expressly aimed their conduct toward California" by contracting with DISH to retransmit Al Arabiya into the United States, including California, one of the largest Arab communities in the United States.

We spend the bulk of our discussion explaining where plaintiff's analysis has gone astray. Once we have completed that, we perform the proper analysis and confirm there was no error.

i. The DISH Retransmissions are Not Defendants' California Contacts

*Walden* is clear that courts must consider the *defendant's* contacts with the forum, not contacts of a third party. However, we agree that, in some cases, when a defendant chooses to act through a third party, the third party's forum contacts can be attributed to the defendant. To be sure, there is California authority – albeit outside the context of defamation – holding that "activities that are undertaken on behalf of a defendant may be attributed to that defendant for purposes of personal jurisdiction if the defendant purposefully directed those activities

22

toward the forum state." (*Anglo Irish Bank Corp. PLC v. Superior Court* (2009) 165 Cal.App.4th 969, 981-982, fn. omitted.) The question is "whether the defendant has purposefully directed its activities at the forum state by causing a separate person or entity to engage in forum contacts."[13] (*Id.* at p. 983.)

Plaintiff argues, "Given that the [defendants] made a deliberate decision to exploit the U.S. market, it ought to make no difference that they decided to use a U.S. agent – DISH – to accomplish the exploitation efforts." But the issue is not whether defendants chose to exploit the U.S. market by causing DISH to retransmit Al Arabiya across the country. The relevant legal question is whether defendants caused DISH to retransmit Al Arabiya *into California.*

To the extent the trial court addressed this issue, it concluded defendants did not do so, a conclusion supported by the evidence. Indeed, plaintiff provided a copy of the Al Arabiya DISH contract, which stated it was being entered into because *DISH* wanted to retransmit Al Arabiya to the *entirety of the United States*, not that the *defendants* wanted to retransmit it into *California.*

The same result was reached by the Central District of California on similar facts. In *Life Bliss Foundation v. Sun TV*

---

[13]    While we consider this to be a preliminary determination we must undertake before deciding whether *Keeton* or *Calder* applies, one could incorporate the determination into the *Calder* test by way of *Walden*. That is, if the defendant did not purposefully direct the third party's activities into the forum State, the third party's activities are not considered acts of the defendant for purposes of considering the defendant's connection to the forum State.

*Network Limited* (C.D.Cal. 2015) 2015 WL 12746219, California plaintiffs brought suit against an Indian television network (Sun TV) in connection with a program it aired in India, which was rebroadcast in California pursuant to a contract with DISH to rebroadcast Sun TV's content in the United States. The court found that this did not support the conclusion that Sun TV purposefully directed its broadcast to California. (*Id.* at *6-*7.) Other cases have similarly held that a national distribution agreement, without more, is insufficient to show targeting of any particular forum state. (See, e.g., *Outdoor Channel, Inc. v. Performance One Media, LLC* (N.D. Okla. 2011) 826 F.Supp.2d 1271, 1276, 1280-1281; *Kuykendall v. Amazon Studios LLC et al.* (S.D. Tex. 2022) 2022 WL 19337992, *9; *John E. Reid and Associates, Inc. v. Netflix, Inc.* (N.D. Ill. 2020) 2020 WL 1330657, *5.)

Plaintiff argues that, since California has the most Arabic speakers in the country, rebroadcasting Al Arabiya into the United States must have included the specific intention to direct it into California – the largest prize.[14] But the conclusion does not follow.

Assuming, without deciding, that plaintiff established that defendants targeted the United States with their news broadcasts, that is only one step toward his goal of establishing defendants targeted California with those broadcasts through

---

[14] Plaintiff's opening brief states, "Plaintiff here lives in California which, were it a country, would be the fifth largest economy in the world." Were size a proxy for intent, *every* national broadcast would be considered to target California – the state with the largest population and economy. Clearly, this cannot be the test.

DISH. Plaintiff focuses on the fact that 12,000 of the 57,000 U.S. Al Arabiya subscribers are in California. As the trial court noted, this "fails to account for the *global viewership* of Al Arabiya Networks and the undisputed evidence that about 99.89% of the networks' viewers live outside California." The trial court was correct to consider the worldwide viewership. Defendants primarily direct their broadcasts in the Middle East and North Africa, where the overwhelming bulk of their audience is. Every international rebroadcasting agreement they may execute does not imply an intention to direct their broadcasts to the largest markets in those countries.

In sum, defendants did not direct DISH to retransmit into California. As such, DISH's forum contacts are those of a third party and cannot be attributed to defendants. For this reason, plaintiff's reliance on cases involving a defendant's own broadcasts in the forum state are inapt. (See, e.g., *Holmes v. TV-3, Inc.* (W.D. La. 1991) 141 F.R.D 692 [defendant Mississippi station carries over the air into forum state Louisiana, and defendant attempted to capitalize on this by soliciting advertisers who wanted to reach the Louisiana market]; *TV Azteca v. Ruiz* (Tx. 2016) 490 S.W.3d 29, 44-46, 49-50 [defendant Mexican channel actually broadcast into forum state Texas and made substantial efforts to benefit from the fact its signal entered the state].)[15]

---

[15] Plaintiff also relies on *Indianapolis Colts, Inc. v. Metro. Balt. Football Club Ltd.* (7th Cir. 1994) 34 F.3d 410. This was a pre-*Walden* case in which the court held effects in the forum state alone were sufficient for jurisdiction. Plaintiff cites *Indianapolis Colts* not for its holding, but for a brief mention of television broadcasts in dicta. (*Id.* at p. 412.) The 7th Circuit has since acknowledged that *Indianapolis Colts* was wrongly decided in

### ii. *Calder* Applies; *Keeton* Does Not

*Keeton* applies when the defendant's forum contacts are actual activity within the forum state; *Calder* applies when the defendant's conduct takes place out of the forum, but causes effects in the forum. (*Licci v. Lebanese Canadian Bank SAL, supra,* 732 F.3d at p. 173.) Because the only forum contacts on which plaintiff relies are the DISH retransmissions, and those are not properly attributable to defendants, this case is governed by *Calder*, not *Keeton*.[16]

---

light of *Walden*. (*Advanced Tactical Ordnance Sys, LLC v. Real Action Paintball, Inc.* (7th Cir. 2014) 751 F.3d 796, 802.)

[16]     Before the trial court, plaintiff attempted to prove additional forum contacts of defendants – in the form of two California individuals who might have performed work for defendants, some networking events defendants sponsored with the USC School of Cinematic Arts, the video on demand streaming service Parent Company launched in the U.S. after the allegedly defamatory broadcasts, and the purported Los Angeles location of the servers on which the Al Arabiya and Al Hadath websites are hosted. Defendants took issue with plaintiff's evidence on all four points – establishing the individuals were not employees; the networking events had nothing to do with increasing defendants' news broadcast audience in California; the streaming service was intended for a global audience, and the websites were hosted in Ireland. The trial court accepted defendants' evidence on these points. In his opening brief on appeal, plaintiff did not challenge these determinations. After defendants suggested in their respondents' brief that plaintiff was no longer pursuing jurisdiction on the basis of these purported contacts, plaintiff attempted to argue them for the first time in his reply brief. As the argument was not raised in plaintiff's opening brief, it is considered waived. (*Westside Center Associates v. Safeway Stores 23, Inc.* (1996) 42 Cal.App.4th 507,

### iii. The *Calder* Analysis

Having concluded that the DISH retransmissions are not chargeable to defendants in the personal jurisdiction analysis, we now turn to *Calder* to determine whether the defendants have purposefully availed themselves of the California forum. In other words, the question is whether the defendants are in the same position as the *National Enquirer* writer and editor in *Calder* – even though they did not control the distribution of the allegedly defamatory publication into California, did they expressly aim their conduct toward California, with the knowledge that their intentional conduct would cause harm in California?[17]

The trial court concluded they had not, finding that California "is neither the focal point of [the allegedly defamatory broadcast] nor the alleged harm suffered." In other words,

529, fn. 21.) In any event, plaintiff simply relies on the facts as though they were established (or "possibly" established) without addressing the factual disputes or the court's resolution of them against plaintiff. These contacts were not established, and we do not consider them.

[17] Our analysis is the same as to both the allegedly defamatory broadcasts – which were not targeted at California but simply relayed to DISH for nationwide rebroadcast – and the website articles and YouTube videos which were also not targeted at California but ended up being viewed here. Plaintiff concedes that the internet views alone "would not likely suffice" to confer personal jurisdiction. The content of the broadcast and the YouTube video was, by definition, identical. The content of the website posts went into greater detail about the places to which the stolen money was allegedly transferred; but, with one minor point we reject below, plaintiff does not suggest this added to the deliberate California contacts.

27

defendants did *not* expressly aim their broadcast to California, nor did they know their broadcast would cause the brunt of the harm there.[18]  The trial court went on to say, "The evidence suggests that the content, preparation, and dissemination of [the broadcast] was not expressly aimed at California, which was merely referenced as context for identifying Plaintiff and perhaps to not[e] his international business practices, given the [broadcast] also reference[s] Plaintiff's offices in Beirut."

There is ample evidentiary support for the trial court's findings.  The focal point of the broadcast here was *Lebanon*. The topic of the article was Nasrallah, and how he allegedly took money from a number of sources (specifically including the *Lebanese State*), was aided by his son and cousin, as well as plaintiff (identified as having an office in *Beirut*) who assisted him in laundering the cash and hiding it around the world. Plaintiff was alleged to have been a player in the story, but he was not the main focus; his involvement was saved for the last paragraph of the television broadcast.

To be sure, the broadcast and website articles state that plaintiff has an office in California, in addition to his Beirut office, but that is as far as the California mentions go.  California is mentioned only once in the broadcast and website articles.[19]  In

---

[18]    In his opening brief on appeal, plaintiff argues the trial court erred in applying the "focal point" analysis, as that is a test for general jurisdiction, not specific jurisdiction in a defamation case.  The claim is belied by the Supreme Court's use of "focal point" language in both *Calder* and *Walden*.

[19]    Plaintiff tries to bulk up the California references, by noting that the broadcast and web articles mention accounting firm KPMG.  Plaintiff represents that KPMG has over 10

contrast, Beirut and Lebanon (or some variant) are mentioned at least eight times in the website articles, and three times in the Al Arabiya broadcast.

Similarly, there is sufficient evidence supporting the trial court's conclusion that the focal point of the alleged harm suffered was also not California. Plaintiff's declaration made much of his California contacts and argued his reputation in California was harmed. But defendants' evidence was that plaintiff's law practice was in Beirut and his address in California was simply a mail drop. That he had friends and family in California cannot be disputed; but there is substantial evidence that the vast bulk of any professional harm he would suffer would be in Lebanon.[20] Moreover, there is the simple fact

---

physical offices, "about half of which are in the Los Angeles area." But the purported California offices of KPMG were *not* mentioned in defendants' broadcast or articles, and we cannot assume a viewer would know the location of KPMG's offices and infer that Al Arabiya was actually broadcasting a story about California. The same fate meets plaintiff's argument that the website articles stated he used the firm Premier Equities and Investment Group Inc. in the money laundering transactions, and his representation that public records reveal Premier Equities to be a dissolved California corporation whose offices were in Los Angeles County. An article does not become more focused on California by mentioning a former corporate entity whose California connection would only be known by readers who searched public records for it.

[20] Plaintiff argues in his reply brief: "Given that [plaintiff] maintains a domicile and works in California, '[i]t is reasonable to expect the bulk of the harm from defamation' was suffered in California. [Citation.]" He may "maintain[] a domicile" in California but he *resides* in Beirut. Likewise, he may, to some

29

that Al Arabiya had only 12,000 subscribers in California – that is the largest number of people who could have seen the broadcast in California and heard the alleged defamation.[21]  This number pales in comparison to the 11 million regular viewers around the world, largely in the Middle East and North Africa.  Strictly on numbers alone, it is much more likely that the broadcast would have been seen over the air by plaintiff's clients or prospective clients in the Middle East than by DISH Al Arabiya subscribers in California.  Lebanon is the focal point.

Even if we set aside the "focal point" language and look directly at the facts the Supreme Court found persuasive in *Calder*, plaintiff fails on every one.  In *Calder*, the story "concerned the California activities of a California resident." (*Calder, supra,* 465 U.S. at p. 788.)  Here, it concerned the Lebanese activities of the Hezbollah leader; to the extent it mentioned plaintiff, it was concerned with his worldwide activities.  In *Calder,* the story "impugned the professionalism of an entertainer whose television career was centered in California." (*Ibid.*)  Here, the article allegedly impugned the professionalism of a lawyer whose practice was centered in Lebanon.  In *Calder,* the article "was drawn from California sources . . . ." (*Ibid.*)  Here, the article was exclusively drawn

---

degree, "work[]" in California, but he is *licensed* to practice law in Lebanon, and that is where his practice is *located*.  It is therefore reasonable to believe the bulk of harm would be suffered in Beirut.

[21]     The YouTube videos added minimal additional viewers in California.  Defendants' evidence was that the Al Arabiya website was blocked; there was no evidence as to how many California views were generated by the Al Hadath website article.

from the Global Fight Against Terrorism Funding website; plaintiff does not allege defendants used California sources. In *Calder,* "the brunt of the harm, in terms both of [Jones's] emotional distress and the injury to her professional reputation, was suffered in California." (*Id.* at p. 799.) Here, the brunt of the harm, both in terms of plaintiff's emotional injuries and damage to his professional reputation, was suffered in Beirut.

Whether phrased in terms of "focal point," or the facts found dispositive in *Calder*, the result is the same. Defendants did not expressly aim their conduct to California, knowing it would cause harm there. As such, there was no purposeful availment, and the trial court did not err in granting the motion to quash.

### 3. *Denial of Continuance for Jurisdictional Discovery*

"A plaintiff attempting to assert jurisdiction over a nonresident defendant is entitled to an opportunity to conduct discovery of jurisdictional facts necessary to sustain its burden of proof. [Citation.] In order to prevail on a motion for a continuance for jurisdictional discovery, the plaintiff should demonstrate that discovery is likely to lead to the production of evidence of facts establishing jurisdiction." (*In re Automobile Antitrust Cases I & II, supra*, 135 Cal.App.4th at p. 127.) A ruling on a motion for a continuance to allow more time for discovery lies within the court's discretion and will not be reversed absent a manifest abuse of that discretion. (*Ibid.*) Specifically, there is no abuse of discretion if the plaintiff failed to show that further discovery was likely to lead to the production of evidence establishing jurisdiction. (*Ibid.*)

Here, before the trial court, plaintiff argued three bases for his request for jurisdictional discovery: (1) defendants did not

provide documentary evidence to back up statements in their sworn affidavits; (2) his evidence raising factual disputes on certain issues (e.g., whether the website servers were in Ireland or California) suggested defendants' sworn affidavits lacked veracity and should be further questioned; and (3) if the trial court were to treat defendants individually, he sought more discovery into their corporate relationship.

None of these bases was reasonably likely to lead to the production of evidence establishing jurisdiction. As to the second point, the trial court specifically concluded that plaintiff's evidence purportedly establishing defendants' evidence was controverted was "insufficient." (E.g., the servers were located in Ireland and the simply relayed to a Content Delivery Network Server in California.) Plaintiff's evidence raised no dispute sufficient to question defendants' veracity, in order to justify the apparent fishing expedition plaintiff sought.

But, more importantly, no amount of jurisdictional discovery could overcome the fact that plaintiff lived and worked in Beirut, where Al Arabiya was free-to-air, leading to the inescapable conclusion that the brunt of any harm he might have suffered was in Lebanon, not California. And this meant that, even with all the jurisdictional discovery he might ever take, he could not satisfy the *Calder* test. The only way plaintiff could ever prevail on the jurisdictional issue, given his own lack of California connection, would be under *Keeton* – if defendants were charged with the retransmissions into California. This, in turn, could only occur if defendants directed DISH to transmit into California. While plaintiff argues, on appeal, that discovery into defendants' relationship with DISH was "obviously necessary," that is not one of the topics on which he sought

discovery before the trial court. Instead, he sought discovery on matters related to the *Calder* analysis, which were not likely to lead to the production of evidence establishing jurisdiction. The trial court therefore did not abuse its discretion in denying plaintiff's request for discovery.

### *DISPOSITION*

The judgment is affirmed. Plaintiff is to pay defendants' costs on appeal.


LEE, J.*

I CONCUR:



KIM, J.

---

\*      Judge of the San Bernardino County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Achraf Safieddine v. MBC FZ, LLC, et al.
B320642


BAKER, Acting P. J., Concurring


Although I do not join all the particulars of the majority's discussion of personal jurisdiction precedent, I do agree the trial court correctly determined it lacked personal jurisdiction over defendants.[1]  In my view, it suffices to say the trial court appropriately found insufficient evidence the defendants purposefully availed themselves of benefits of California as a forum.  (*Burger King Corp. v. Rudzewicz* (1985) 471 U.S. 462, 475-476; see also *Walden v. Fiore* (2014) 571 U.S. 277, 290 ["The proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way"]; *Calder v. Jones* (1984) 465 U.S. 783, 788-789 [holding personal jurisdiction over libel defendants existed when the allegedly libelous story concerned the California activities of a California resident, impugned the professionalism of an entertainer whose career was centered in California, was drawn from California sources, and caused the brunt of the emotional and reputational harm in California—all facts that are absent here].)  Confining the

---

[1]    I also agree the trial court did not abuse its discretion in denying the nonspecific, one-paragraph request for jurisdictional discovery that plaintiff made at the end of his opposition to defendants' motion to quash the summons for lack of personal jurisdiction.

analysis to these necessary points has the salutary effect of avoiding any suggestion that personal jurisdiction could not be had elsewhere in the United States, which is a position that even defendants did not take at oral argument (positing instead that personal jurisdiction might lie in Colorado).


BAKER, Acting P. J.

Filed 7/24/24

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| ACHRAF SAFIEDDINE, | B320642 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. 21STCV04636) |
| v. | |
| MBC FZ, LLC, et al., | **ORDER CERTIFYING OPINION FOR PUBLICATION** |
| Defendants and Respondents. | |

THE COURT:

The opinion in the above-entitled matter filed on June 26, 2024, was not certified for publication in the Official Reports.  Upon respondent's request, for good cause appearing, and pursuant to California Rules of Court, rule 8.1105(b), it is ordered that the opinion should be published in the Official Reports.

_____

BAKER, Acting P.J.  KIM, J.  LEE, J. *

_____

* Judge of the San Bernardino Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.